IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CHRISTINA RILEY and JACQUELINE OVERTURF, <br><br> Plaintiffs, <br><br> vs. <br><br> STATE OF HAWAII DEPARTMENT OF PUBLIC SAFETY; GRW CORPORATION; GIL WALKER, Individually and in his Capacity as Chief Executive Officer of GRW Corporation; JOHN DOES 1-25; JANE DOES 1-25; DOE OFFICIALS 1-25; and DOE ENTITIES 1-25, <br><br> Defendants. | CIVIL NO. 06-00563 JMS/KSC <br><br> ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

**ORDER DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

Plaintiffs Christina Riley ("Riley") and Jacqueline Overturf ("Overturf") were allegedly sexually assaulted by a prison guard while incarcerated by Defendant State of Hawaii Department of Public Safety at the Brush Correctional Facility ("BCF")[1] in Brush, Colorado. Defendants claim that

---

[1] BCF is owned and operated by Defendant GRW Corporation ("GRW") of which Defendant Gil Walker is CEO.

Plaintiffs failed to exhaust their administrative remedies under the Prison Litigation Reform Act ("PLRA") prior to filing suit. Because Plaintiffs reported the alleged sexual assault pursuant to BCF's emergency grievance procedures, the court DENIES Defendants' Motion for Summary Judgment.

## II.  BACKGROUND

**A.     Factual Background**

On January 8, 2005, Plaintiffs were allegedly sexually assaulted by Russell "Rusty" Rollison ("Rollison"), a BCF adult corrections officer. Pls.' Exs. 4 & 5.[2]  As Overturf describes the events,

> at approximately 8:30, Officer Rollison appeared at the law clerks office. He said, "what's going on ladies, it looks like we have a sexual going on. I could write you both up." I stood up and Rollison pushed me against the file cabinet shut the light out and grabbed Christina [Riley] by the shoulder and said, "we can handle this informally." He started taking her shirt off and started to touch her breast. He started kissing me and I heard him unzip his pants. I heard Christina gagging[3] and he started to push me down. He started to cum in my mouth and pulled me away before he was finished and came on our faces. I spat it up and wiped my face with a rag I use for dusting the

---

[2] In Opposition to Defendants' Motion, Overturf asserts that Rollison first vaginally raped her sometime in December 2004. See Pls.' Exs. 11, 12 & 13. The Complaint, however, only sets forth specific allegations concerning the January, 2005 rape and sexual assault.

[3] Riley stated that Rollison grabbed her by the hair at the back of her head and forced her to perform oral sex on him.

> office.[4]  He acted as if nothing happened and asked me to make him a copy of [a] whole book for his class.

Pls.' Ex. 12.

Although initially reluctant to tell anyone of the incident, Plaintiffs were convinced by Overturf's counsel to report Rollison.  BCF had adopted Administrative Regulation 850-4 ("AR 850-4") effective September 1, 2004, with revisions adopted June 15, 2004.  *See* Defs.' Ex. 1, Bates 001-015.  Under AR 850-4, BCF implemented three different grievance procedures, all of which entail receiving and completing grieving forms provided by the inmates' Case Manager.  Inmates are "limited to a single subject matter and remedy per grievance."  AR 850-4 § IV(C)(1)(b) at Bates 009.  Remedies to a grievance "may include modification of institution policy, restoration of, or restitution for personal property, the assurance that unjustifiable abuse will not recur, or such other remedies that will meaningfully resolve the problem."  AR 850-4 § IV(B)(2)(b) at Bates 008.

The first procedure, entitled "Informal Grievance Procedure," provides that the inmate

> shall obtain an Informal Resolution Attempt form BCF form

---

[4] Overturf mailed the rag and Riley's shirt to a friend for safekeeping.  The materials were later forwarded to BCF which confirmed that the DNA semen samples matched Rollison.  Pls.' Ex. 13.

> 850-4A from her Case Manager . . . complete the upper portion of the form and deliver it to her case manager.
> (a) The Case Manager will initial and forward the completed document to the Warden's Office for logging. . . .
> (b) The staff member will contact the [inmate] in an attempt to resolve the grievance informally. If the staff member and the [inmate] are unable to resolve this grievance informally, the staff involved shall state in writing on the Informal Resolution Attempt form what was done to attempt to resolve the grievance informally and will have the [inmate] complete and sign the bottom portion of the document.

AR 850-4 § IV(C)(1) at Bates 001.

The second grievance procedure available, entitled "Formal Grievance and Response Procedures," establishes a 3-step grievance process:

> (b) Step I. When an [inmate] has reason to submit a Step I grievance, BCF Form 850-4B may be obtained from her Case Manager. The Case Manager will forward the grievance . . . .
> (c) Step II. In the event that the [inmate] elects to proceed with a Step II grievance, the appropriate form, BCF Form 850-4A, shall be obtained from her Case Manager, completed by the [inmate], and returned to the Case Manager. . . .
> (d) Step III. The BCF Step III Grievance Officer is Vice President of Operations for GRW Corporation.

AR 850-4 § IV(C)(2) at Bates 001-02. An inmate "with a complaint or problem that cannot be resolved through discussion or dialogue with appropriate staff shall file a Step 1 grievance" within 30 calendar days from the date the offender knew (or should have known) of the facts giving rise to the grievance. AR 850-4 §§ IV(C)(2), (D)(2) at Bates 010. Step 1 and 2 appeal grievances are required to

be filed within five days of the denial of the prior grievance. AR 850-4 § IV(B)(1)(n) at Bates 008.

> Finally, BCF adopted "Emergency Procedures" which provide that
>
> [t]he Case Manager shall be responsible to handle emergency grievable issues. . . . Case Managers are to review the content of the grievance and determine if the grievance is of a serious nature, requiring immediate resolution. Notification shall be made to the Warden or designee if immediate action is indicated.

AR 850-4 § IV(C)(4) at Bates 002. AR 850-4 directs that the emergency grievance procedures should be implemented "when there are indications of potential and substantial risk to the life or safety of the individual, or when irreparable harm to the individual's health is imminent." AR 850-4 § IV(F)(1) at Bates 012. An inmate

> who articulates an emergency to his/her case manager or other staff member, *shall* be directed to complete a grievance form which will be immediately forwarded to the administrative head, or designee, for review. The administrative head, or designee, after consulting with the appropriate department, shall determine if an emergency exists. If the emergency does exist, a remedy shall be devised and implemented. A written response documenting the remedy must be rendered within 48 hours and provided to the [inmate]. If, after consultation with the appropriate persons, the grievance is determined to not be an emergency, it shall be routed through normal channels as a Step 1 grievance and procedures outlined in this AR shall apply.

*Id.* (emphasis added).

Plaintiffs met with their Case Manager, Cher Gettman-Ehn, ("Gettman-Ehn") on January 11, 2005.  *See* Pls.' Ex. 5.  After listening to Plaintiffs' accounts, Gettman-Ehn told Plaintiffs that she must report the situation to her supervisors.[5]  *See* Riley Dep. Tr. at 77, attached as Defs.' Ex. B; Pls.' Exs. 5 & 10.  According to Gettman-Ehn's incident report, "I instructed both inmates to write me a detailed statement to include: dates, times, when, where, who and what was said.  Both agreed."  *See* Pls.' Ex. 5.  Plaintiffs complied, providing statements by January 12, 2005.  Pls.' Exs. 4 & 12.  As instructed, both Plaintiffs set forth details concerning their complaint, including the date, time, place, who was present, and details concerning the events, including what was said.  In other words, Plaintiffs provided detailed statements precisely as instructed by Gettman-Ehn.[6]

On January 13, 2005, Plaintiffs were interviewed at length by Investigator Grace Beard of the Colorado Department of Corrections, Office of the Inspector General.  Pls.' Ex 13, Bates 029-045.  Overturf's interview was

---

[5] Gettman-Ehn reported the incident to Captain Werner and Major Steve Hall, BCF's Chief of Security, immediately after her meeting with Plaintiffs.  *Id.*

[6] Later, Riley submitted a February 27, 2005 State of Hawaii Department of Public Safety Inmate Complaint/Grievance form stating that "I am submitting this as a 3rd step emergency grievance.  I was forced to give oral sex to a corrections officer in the Brush Correctional Facility on January 8, 2005."  Pls.' Ex. 7.

subsequently documented in an eight-page Incident Narrative Report. *Id*. at 029-036. Riley's interview was documented in a nine-page Incident Narrative Report. *Id*. at 037-045.

Following Plaintiffs' meeting with Gettman-Ehn and submission of their written statements, BCF began investigating Rollison. Pls.' Exs. 6 & 13. Rollison failed to appear for work on January 11, 2005 and disconnected his phone. *See* Pls.' Ex. 13. BCF Officers visited Rollison's home to inform him that he was placed on immediate suspension. *Id.*; Pls.' Ex. 14. On January 13, 2005, two days after Plaintiffs reported the sexual assault, Rollison admitted to investigators that he had engaged in sexual activity with the Plaintiffs (although he contended that the encounter was consensual). *See* Pls.' Ex. 13. Rollison later resigned, and was later convicted of a criminal offense relating to the January 8, 2005 incident. *See* Pls.' Ex 15.

**B.    Procedural Background**

Plaintiffs filed their Complaint in the State of Hawaii Circuit Court for the First Circuit on September 18, 2006 alleging violations of 42 U.S.C. § 1983, negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, respondeat superior liability, and punitive damages claims. The State of Hawaii Department of Public Safety removed the matter to federal

court and filed its Answer on October 17, 2006.  GRW joined the removal and filed its Answer on October 27, 2006.

On July 17, 2007, the State of Hawaii Department of Public Safety filed its Motion for Summary Judgment arguing that Plaintiffs failed to exhaust their administrative remedies under the PLRA.  Plaintiffs filed their Memorandum in Opposition on September 10, 2007 and filed a Supplemental Memorandum in Opposition on September 14, 2007.  Defendants filed their Reply on September 13, 2007.  The court heard oral arguments on September 17, 2007 and ordered supplemental briefing which the State of Hawaii Department of Public Safety submitted on September 26, 2007 and Plaintiffs submitted on September 27, 2007.

### III.  STANDARD OF REVIEW

A party is entitled to summary judgment where there is no genuine issue of material fact.  Fed. R. Civ. P. 56(c).  When reviewing a motion for summary judgment, the court construes the evidence -- and any dispute regarding the existence of facts -- in favor of the party opposing the motion.  *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1086 (9th Cir. 2001).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Thus, summary judgment will be mandated if the non-moving party "'fails

to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999) (*quoting Celotex*, 477 U.S. at 322).

## IV.  ANALYSIS

The question before the court is whether the Plaintiffs exhausted their administrative remedies under the PLRA, 42 U.S.C. § 1997e(a).  The PLRA provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Prisoners must exhaust their administrative remedies prior to seeking relief in federal court, even where the administrative process itself cannot provide the specific form of remedy sought.  *Booth v. Churner*, 532 U.S. 731, 739 (2001).  The PLRA exhaustion requirement "applies to all prisoners seeking redress for prison circumstances or occurrences." *Porter v. Nussle*, 534 U.S. 516, 520 (2002).  To properly exhaust administrative remedies, an inmate must complete the review process governed by "rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 127 S. Ct. 910, 922 (2007).  If a prisoner fails to fully comply with the available administrative procedures, including timely

filing of the initial grievance, the prisoner will be barred from seeking redress through the federal courts. *Woodford v. Ngo*, 126 S. Ct. 2378, 2386-88 (2006). The exhaustion requirement thus "allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[,]" *Jones*, 127 S. Ct. at 914, and recognizes that "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." *Woodford*, 126 S. Ct. at 2385.

        The Supreme Court has explained that the purpose of the PLRA's exhaustion requirement is "to reduce the quantity and improve the quality of prisoner suits; to this purpose Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter*, 534 U.S. at 524-25. The exhaustion requirement thus decreases frivolous suits; fosters corrective action to improve prison administration; and provides an administrative record for suits that are pursued. *See Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005).

        The issue before the court is whether Plaintiffs properly exhausted "such administrative remedies as are available" prior to filing their Complaint. The PLRA's purposes are not "served by a requirement that a prisoner continue to pursue administrative review after all 'available' relief has been accorded." *Id.*

In the present case, Plaintiffs grieved the rape and assault through the emergency grievance procedure. In all three of the grievance procedures available at BCF (informal, formal, and emergency), inmates must meet with their Case Manager to request and receive the appropriate grievance forms. Plaintiffs, in fact, did meet with their Case Manager, Gettman-Ehn, within three days of the alleged sexual assault. Under AR 850-4, it was within Gettman-Ehn's discretion to designate the assault as an "emergency grievable situation." *See* AR 850-4 § IV(C)(4) at Bates 002 ("Case Managers are to review the content of the grievance and determine if the grievance is of a serious nature, requiring immediate resolution."). Recognizing the exigency and seriousness of the situation, Gettman-Ehn treated Plaintiffs' allegations as an emergency, directing Riley and Overturf to complete detailed written statements and immediately contacting her superiors.[7] *See* AR 850-4 § IV(F)(1) at Bates 012 (An inmate "who articulates an emergency to his/her case manager or other staff member, shall be directed to complete a grievance form which will be immediately forwarded to the administrative head, or designee, for review. The administrative head, or designee, after consulting with the appropriate department, shall determine if an

---

[7] In fact, in Overturf's Chronological Record, Gettman-Ehn wrote that on January 11, 2005, "Overturf came to my office stating that she had an emergency." Pls.' Ex. 10.

emergency exists."); Riley Dep. Tr. 76, attached as Defs.' Ex. B (Riley "asked [Gettman-Ehn] for a grievance form again. And [Gettman-Ehn] said she had to report it."). BCF also treated Plaintiffs' claims as an emergency, reporting the allegations up the chain of command and commencing an immediate investigation.

Defendants argue that Plaintiffs' claims should be barred under the PLRA because they did not engage in the 3-step process.[8] According to Defendants,

> when an inmate reports that an assault occurred, there are two distinct paths which the inmate can take. One path is to do nothing more as did Plaintiffs in this case. A second available path which may not necessarily be taken is for the victim to file a grievance -- a request that the facility remedy the situation by providing the victim with medical treatment, taking a variety of actions to ensure that no future assaults occur, or even a request for some type of compensation. Unless the inmate takes this second administratively available path, the PLRA bars the inmate from subsequently pursuing a lawsuit.

Defs.' Supplemental Mem. 9. The court rejects this argument.[9] Defendants fail to provide any legal or factual analysis as to why Plaintiffs should be required to

---

[8] There is some evidence that Riley and Overturf were familiar with the 3-step grievance process. *See, e.g.*, Pls.' Ex. 17 (grievances filed by Overturf and Riley). Plaintiffs dispute their knowledge of the 3-step grievance process, arguing that they were not informed of those procedures and that the 3-step process itself was confusing. It is not necessary for the court to reach these alternate arguments.

[9] The court likewise rejects the factual assertion that after reporting the alleged sexual assault, Plaintiffs did "nothing more." Plaintiffs did exactly what their Case Manager instructed them to do -- they provided a detailed written statement.

exhaust through the 3-step grievance process in addition to exhausting their remedies through the emergency grievance procedures as set forth by AR 850-4.[10] Nor is the court aware of any rule requiring inmates to exhaust their grievance through multiple administrative channels. Indeed, AR 850-4 itself treats the 3-step grievance process and the emergency grievance procedures as alternative, not corollary, processes. The "Emergency Procedures" section of AR 850-4 states that BCF "shall implement *these emergency grievance procedures*. . . ." (emphasis added). Further, a grievance filed and originally treated as an emergency will be converted to a Step 1 grievance only if "after consultation with the appropriate persons, the grievance is determined to not be an emergency, [in which case] it shall be routed through normal channels as a Step 1 grievance and procedures outlined in [AR 850-4] shall apply." AR 850-4 § IV(F)(1) at Bates 012.

        Defendants next argue that the emergency grievance procedures were not applicable because "Plaintiffs were reporting an assault that occurred -- they were not articulating an emergency." Defs.' Supplemental Mem. 3. Defendants' argument is utterly unpersuasive. As Defendants concede, the emergency

---

[10] AR 850-4(D) requires an inmate to file a Step 1 grievance using a specific form, DC Form 850-4A, the Offender Grievance Form. AR 850-4(F), the Emergency Procedures regulation, does not require the inmate to complete a specific form, but simply requires the Case Manager to direct the inmate to complete "a grievance form." The fact that Plaintiffs did not utilize a particular form is irrelevant; they were instructed to provide a detailed written statement.

grievance provisions apply where there are imminent or exigent concerns regarding an inmate's health or safety.  Other than assaults causing death or grievous and permanent bodily injury, the court cannot conceive of an abuse more urgent than repeated sexual assault and rape of inmates by a prison guard.  All parties involved, including Plaintiffs and prison officials, treated the matter as an "emergency."  Immediately following the reporting of the charged sexual assault, a comprehensive investigation followed.  Two days later, on January 13, 2005, Rollison admitted to sexual contact with Plaintiffs (although he claimed the contact was consensual).  Because the alleged sexual assault was a matter of "potential and substantial risk to the . . . safety" of Plaintiffs, the emergency grievance procedure was appropriate.  *See* AR 850-4 § IV(F)(1) at Bates 012.

   Despite their fear of retaliation, Plaintiffs reported the rape and sexual assault to their Case Manager.  Following Gettman-Ehn's instructions, they completed and submitted detailed written accounts of the attack.  Although upset and traumatized, both Plaintiffs participated in lengthy interviews with investigators, answering questions and providing additional details about Rollison, the incident, and other matters at the prison.  If prison officials wanted or expected Riley and Overturf to complete a different grievance form, they should have provided Plaintiffs with the additional paperwork and instructed them to do so.

*See* AR 850-4 § IV(F)(1) at Bates 012 (An inmate "who articulates an emergency to his/her case manager or other staff member, shall be directed to complete a grievance form. . . ."). As it was, Plaintiffs followed all of BCF's instructions and properly filed their grievance under the emergency grievance procedures. The record also reveals that the emergency grievance procedures gave Defendants ample notice of Plaintiffs' claims and opportunity to address the situation. The court finds that Plaintiffs exhausted available administrative remedies under the PLRA.

## V.  CONCLUSION

Plaintiffs exhausted their administrative remedies by grieving the rape and sexual assault as provided for by the emergency grievance process. Defendants' Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, October 17, 2007.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Riley et al. v. State of Hawaii Dep't of Public Safety et al.*, Civ. No. 06-00563 JMS/KSC, Order Denying Defendants' Motion for Summary Judgment